# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**CLAIRMONT MELVILLE,**

      **Petitioner,**

                               **CASE NO. 2:06-cv-992**
   v.                             **CRIM. NO. 2:91-cr-023**
                               **JUDGE GRAHAM**
                               **MAGISTRATE JUDGE KING**

**UNITED STATES OF AMERICA,**

      **Respondent.**

## REPORT AND RECOMMENDATION

On November 6, 2007, the United States Court of Appeals for the Sixth Circuit authorized the filing petitioner's successive motion under 28 U.S.C. §2255. *See* Doc. No. 70. On February 4, 2008, respondent filed a response to petitioner's §2255 petition, Doc. No. 75, and on April 7, 2008, petitioner filed a reply, Doc. No. 79. The parties have also filed supplemental affidavits relating to petitioner's claims. *See* Doc. Nos. 84, 87, 88. Upon review of the entire record and for the reasons that follow, the Magistrate Judge **RECOMMENDS** petitioner's request for an evidentiary hearing be **GRANTED**, and that petitioner be appointed counsel to represent him at an evidentiary hearing on his claim that the prosecutor improperly failed to disclose or correct the allegedly false testimony of a trial witness who denied the existence of an agreement to reduce the witness' sentence in return for his testimony against petitioner. The Magistrate Judge further **RECOMMENDS** that petitioner's claim of prosecutorial misconduct based on the witness' allegedly false testimony denying that he had met with police and the prosecution prior to testifying

against petitioner be **DISMISSED**.

The United States Court of Appeals for the Sixth Circuit summarized the facts of petitioner's underlying criminal conviction as follows:

> In the summer of 1990, the Bureau of Alcohol, Tobacco and Firearms and the Columbus Police Department Narcotics Unit began an investigation of individuals who were operating a series of crack houses in Columbus, Ohio. Testimony at trial established that Ken Adams, a native of Guyana, came to Columbus from New York City in 1988. Soon after arriving, Adams began to sell crack cocaine from ever-shifting locations in the city. To supply his customers, Adams regularly traveled to New York and purchased kilogram quantities of cocaine.
>
> On one of these trips in late 1989, Adams ran into his childhood friend from Guyana, Clairmont Melville. After Melville related that he was about to be laid off from his job, Adams offered Melville a position as a courier of cocaine between New York and Columbus. Over the course of the next year, Melville became one of Adams' trusted associates.
>
> In Columbus, Melville often served as the on-site manager of Adams' crack house, dispensing rocks of crack cocaine to "salespeople" and collecting the sales proceeds. Melville generally had little direct contact with the customers, preferring instead to deal through other employees, including Aaron "Jamaican Tony" Farley, Michael "Dog" Watson, Theresa Carter, and Tina Sutton. On occasion, Melville also packaged cocaine for sale and delivered cocaine supplies to the various crack houses. During this time, Melville regularly carried a gun.
>
> Melville's other major role involved accompanying Adams on his trips to New York. Every few weeks, Adams would shut down his crack house and travel to New York with Farley and Melville. Melville frequently returned to Columbus by Greyhound bus with cocaine concealed in a carry-on bag.
>
> In August 1990, ATF agents made five controlled purchases of

crack cocaine (for a total of one gram) at two residences that were being used as crack houses by Adams and his associates. On August 30, ATF agents executed a search warrant at the crack house located at 1791 Franklin Park South. Inside the house, the agents found Melville, Farley, and four other individuals. They also discovered a loaded .357 revolver, ammunition, cocaine residue, and drug paraphernalia. Following a brief detention, Melville was released.

In November, Adams moved the location of his crack house first to 1157 East Livingston Road, then to 613 and 660 South Champion Avenue, and finally to 1401 Lockbourne Road. After undercover officers made numerous controlled purchases at these locations, Columbus Police detectives executed a search warrant at 660 South Champion Avenue on November 26. During the search, the officers found Carter, Watson, and another woman. They also uncovered 3.1 grams of crack, drug paraphernalia, and $160.00. Three days later, the detectives executed a search warrant at the 1401 Lockbourne Road location. Inside the home, the officers found Farley, Melville, and Sutton. A .22 caliber handgun was discovered in the room with Farley and Melville. The officers also recovered drug paraphernalia, cash (including marked money from the controlled buys), and drug residue. Melville was arrested on aggravated trafficking charges. On December 10, these state charges were dismissed pending federal indictment. After his release from jail, Melville returned to New York.

A federal grand jury returned a two-count indictment against Melville and Adams on April 18, 1991. Count One charged both defendants with conspiring to distribute and possess with the intent to distribute over fifty grams of cocaine base, in violation of 21 U.S.C. § 846. Count Two charged Adams alone with possession of over five grams of crack cocaine with the intent to distribute. On April 19, 1991, an arrest warrant was issued for Melville.

Melville was arrested in New York on March 30, 1992. After a New York magistrate judge signed a commitment order on April 8, Melville was transported to the Southern District of Ohio, arriving at the Franklin County Jail on April 14.

> Although a magistrate judge in Columbus appointed counsel for Melville on May 28, Melville did not appear before a judicial officer until his arraignment on July 17.
>
> Trial, initially scheduled for August 3, was rescheduled several times after Melville's first two appointed attorneys were disqualified by the district court because they represented other Adams associates. Melville's trial counsel subsequently filed two motions for a continuance to gain additional time to prepare for trial.
>
> Following a five-day trial, a jury convicted Melville of conspiracy on November 13. On June 10, 1993, the district court sentenced Melville to a 235-month term of imprisonment.

*United States v. Melville*, 30 F.3d 134 (6th Cir. 1994). Petitioner filed a timely appeal in which he raised the following assignments of error:

> [1. T]he three-month delay between his arrest and arraignment constitutes a violation of his right to a speedy trial.
>
> \*\*\*
>
> [2. T]he district court attributed an excessive quantity of cocaine to him for sentencing purposes.
>
> \*\*\*
>
> [3.] Melville challenges the district court's imposition of a two-level enhancement pursuant to Section 2D1.1(b)(1) of the Sentencing Guidelines for possession of a firearm during the commission of a drug offense. According to Melville, the government never established that the weapon seized at the time of his arrest in November 1990 was connected to the drug offense. He also contends that any testimony regarding the possession of weapons by other members of the conspiracy was conclusory and cannot support the enhancement.
>
> \*\*\*

> [4.] Melville argues that the district court improperly enhanced his sentence pursuant to Section 3B1.1(c) of the Sentencing Guidelines based upon its determination that he was a manager or supervisor of the conspiracy's criminal activity.

*See id.*[1]

The Court of Appeals having authorized the filing of a successive petition, *see* Doc. Nos. 61, 70, petitioner now asserts that he was denied a fair trial under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), because the prosecutor failed to disclose an agreement with prosecution witness Ken Adams whereby the prosecutor would seek a reduction of Adams' sentence in return for his testimony against petitioner at trial. Petitioner also asserts that Adams lied when he testified that he had never met with police or the prosecution prior to testifying against petitioner and when he denied that he anticipated a reduction in his sentence in return for such testimony.[2] Petitioner further asserts that he was denied a fair trial based on the prosecutor's improper failure to correct Adams' false trial testimony.

---

[1] On June 21, 1994, the United States Court of Appeals for the Sixth Circuit affirmed petitioner's convictions and sentence. *Id*. The United States Supreme Court denied petitioner's petition for a writ of *certiorari*. Doc. No. 48. On September 23, 1998, this Court denied petitioner's April 10, 1997, first motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. §2255. Doc. No. 55. On November 16, 1999, the United States Court of Appeals for the Sixth Circuit denied petitioner's request for a certificate of appealability as to the claims asserted in plaintiff's first §2255 petition. Doc. No. 60.

[2] According to petitioner, Attorney Lewis Dye, Adams' defense counsel, contacted the government at Adams' request on numerous occasions prior to petitioner's trial, seeking a reduction of Adams' sentence in return for Adams' trial testimony against petitioner.

In support of his allegations in these proceedings, petitioner has submitted his own affidavit as well a "statement" in which Ken Adams, who now resides in Guyana, made sworn response to written questions:

> I was convicted of conspiracy to distribute [] cocaine base and other related charges... on June 6, 1991.
>
> ***
>
> I was initially contacted by my attorney, Lewis Dye. Mr. Dye advised that he was acting at the behest of AUSA Gary Spartis who had promised that if I agreed [to] testify against Melville I would receive a substantial sentence reduction.
>
> ***
>
> I was contacted in early November 1992, about fourteen months after I was sentenced.
>
> ***
>
> ... I was contacted by AUSA Gary Spartis.
>
> ***
>
> My first direct contact with AUSA Spartis was on November 9, 1992,[3] when I returned to Ohio to testify against Melville.

Where were you housed when the representative from the U.S. Attorney's Office contacted you?

---

[3] The Court notes that November 9, 1992, was the first day of petitioner's trial.

> I was housed at Franklin County Jail in Columbus, Ohio.

Was anyone from any police agency with the representative from the U.S. Attorney's Office when they met with you?

> No.

Did anyone from the Columbus Police Department meet with you regarding your testimony in the Melville case?

> No.

Were you promised anything in exchange for testimony in Melville case?

> Yes.

\*\*\*

> Both AUSA Spartis and attorney Lewis Dye repeatedly assured me that if my testimony led to Melville's conviction I would receive a substantial reduction of my sentence. AUSA Spartis stated that Judge Graham would make the final decision about this reduction but he would speak with Judge Graham to ensure that my sentence was reduced by more than half.

How many years were deducted from your sentence in exchange for your testimony in the Melville case?

> My sentence was reduced to a term of sixteen (16) years.

What was the nature of Melville's involvement in your drug activities in either New York or Ohio?

> He was not involved. Melville and I were childhood friends in Guyana. We met again at a party in Brooklyn during the summer of 1990 and I invited him to my home in Columbus, Ohio. Because he was honest and trustworthy, I intended to use him as a courier to transport proceeds from my drug activities in Ohio back to New York. However, shortly after Melville arrived in Ohio I discovered that he was [a] drug addict and decided that it would be inherently counterproductive to get him involved in any aspect of my business.

*Statement of Ken Lloyd Adams*, March 28, 2007, *see* Doc. Nos. 84, 88.[4] Petitioner also states that he hired a private investigator, Gary Phillips, who spoke to Attorney Lewis Dye about Dye's involvement in securing a cooperation agreement with the government on Adams' behalf. *See Petition*, at 5-6. However, neither party has submitted an affidavit from either Phillips or Dye.

Respondent denies that the government had any agreement with Adams. Respondent further suggests that Adams' affidavit may be a forgery because, *inter alia*, the signature on that affidavit differs from the signature that appears on a January 1991 financial affidavit, *see Exhibit attached to Government's Response*, Doc. No. 75, and because the language in the affidavit is not couched in words likely to have been Adams' own.

In response to petitioner's allegations, respondent has submitted the declaration of Assistant United States Attorney Gary L. Spartis, the prosecutor in this case, who denies that he made any promise to Adams to file a request for reduction of Adams' sentence in return for Adams' testimony against petitioner. Spartis also avers in relevant part:

---

[4] Adams has apparently been deported. *See Government's Response*, at 11 n. 3.

I was the Assistant United States Attorney assigned to this case. ...

Co-defendant Ken Adams was convicted after trial on June 6, 1991 and sentenced to 360 months imprisonment. Clairmont Melville was arrested almost a year later and was set for trial Nov. 9, 1992.

The following are the events related to this case to the best of my recollection:

Counsel for Adams, Lewis Dye called the undersigned several times prior to Melville's trial and indicated that Adams was willing to cooperate and testify against Melville. Initially, I told Mr. Dye that we were not interested in Adams' assistance. After discussing the matter with the case agent, I changed my mind and decided to writ Adams back to Columbus for the Melville trial. At no time prior to his trial testimony did I tell Adams' attorney, Lewis Dye, that I would file a motion for reduction of Adams' sentence.

A day or two before trial, Detective Jennifer Benson, Columbus Police Department, Attorney Lewis Dye, and I met with Ken Adams at the Franklin County Jail. Prior to that meeting, I had never before met with Adams. Mr. Dye only stayed for a brief period and then left.

After interviewing Adams, I decided that I would likely call him as a witness in Melville's trial. At no time did I promise Adams that I would file a Rule 35 Motion on his behalf. I never promised him that he would receive any reduction in his sentence. Further, it has never been my practice to predicate a motion for reduction on a successful trial result.

On January 19, 1993, I filed a Rule 35 Motion for Reduction on Adams' behalf as a result of the substantial assistance provided by Adams. I made no recommendation regarding the extent of

9

> the reduction nor did I have any contact with the Court regarding the extent of the reduction.
>
> On May 4, 1993, the Court granted the Government's Rule 35 Motion and reduced Adams' sentence from 30 years imprisonment to 16 years imprisonment.

*Declaration of Assistant United States Attorney, Exhibit* attached to *Government's Response*, Doc. No. 75.

The government's January 13, 1993, motion in Adams' case, *United States v. Adams*, CR-2-91-0023(1), Doc. No. 20, pursuant to §5K1.1 of the United States Sentencing Guidelines and Rule 35 of the Rules of Criminal Procedure, reads in relevant part as follows:

> ... Defendant Ken Adams recently testified as a government witness in the trial of *United States v. Clairmont Melville*, CR-2-91-023, during the week of November 9, 1992. The evidence against Clairmont Melville consisted primarily [of] co-conspirators' testimony. The case against Melville was largely a historical drug conspiracy. The ... testimony of Ken Adams was instrumental in obtaining the guilty conviction against Melville. Adams testified thoroughly and very candidly regarding his own involvement and the involvement of Melville in Adams' drug operation.
>
> Adams was originally sentenced on September 11, 1991, to a period of 30 years for federal drug violations. ... Adams' testimony in the Melville trial occurred during the week of November 9, 1992, a little over one year after his sentence.... [T]he attorney for Adams indicated to the government that Adams would cooperate and testify against any other co-conspirators, including Melville. The government believes that this representation was made both some time before Melville's arrest and after Melville was arrested in July of 1992.

> ... Counsel for the government did not have an opportunity to debrief and interview Adams until he was brought back for the Melville trial on November 9, 1992. It was during that initial interview on November 9, 1992, that counsel for the government realized that Adams was serious about cooperating.
>
> ... [S]ome of the information that Adams is supplying involves information that was not known by Adams until after the imposition of sentence. It is the government's understanding that Adams continues to supply information or intelligence regarding drug activity that is ongoing.
>
> THEREFORE, the United States respectfully requests ... [the] Court to ... modify the defendant's original sentence as the court sees fit.

*United States v. Ken Lloyd Adams,* CR-2-91-0023(1), Doc. No. 20; *see also Exhibit* attached to petitioner's first *Motion to Vacate, Set Aside or Correct Sentence*, Doc. No. 49.

Although other witnesses also testified to petitioner's involvement in the charges at issue, *see, e.g.*, testimony of Kim Taylor, Tina Sutton, and Michael Watson, the record suggests that it was the testimony of Ken Adams that proved most damaging to petitioner. Adams testified, *inter alia*, regarding the details of the drug business, locations where drugs were obtained and sold, quantities of drugs sold and petitioner's use of a firearm during the commission of the offense(s) at issue. *See Transcript*, at 295-361. Adams had known petitioner for more than fifteen years. *Id.*, at 298. They were "best friends," both having been raised in Guyana. *Id.*, at 297, 299. At the time of trial, Adams was serving a sentence of 360 months incarceration. He denied that anyone had promised him a reduction of his

11

sentence in exchange for his trial testimony against petitioner. *Id.*, at 297. He testified as follows:

> [On cross examination]
>
> Q. Now, what affect will your testimony have on that today? What is your understanding of what [e]ffect your coming in and testifying here today will have on that sentence?
>
> \*\*\*
>
> A. Nothing.
>
> Q. Okay. You have not heard of Rule 35(b) having your sentence reduced?
>
> A. No.
>
> Q. Okay. On what basis then are you here?
>
> A. I [am] testifying because now Clairmont and me and Maitland all was friends and when I got busted no one looked back or no one tried to get in touch with me, no one cared and I just wanted him to experience what I have been through because all we was enjoying it. Not really me alone was enjoying it and I wouldn't really go and send the police to their house, but so long as they come here and as I got caught I would cooperate with the government because of the way they treat me. I don't care if I don't get anything, you know.
>
> Q. So because you have been arrested and you have been sentenced to 30 years in jail, you want Clairmont to experience that as well?

> A. Yes.

*Id.*, at 363. Adams also denied that he had met with government officials prior to testifying against petitioner:

> Q. Have you had any discussions with anyone from the government with regards to coming in here or did you just show up here one day? By here, I mean in the courtroom to testify?
>
> A. I didn't have no discussion. I got a call from the Correction Officer and they said you have to go to court. I didn't know what I was coming for or nothing.

*Id.*

In *Brady v. Maryland, supra,* the United States Supreme Court held that

> the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Brady v. Maryland, supra,* 373 U.S. at 86. Evidence is material

> [i]f there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

*United States v. Bagley,* 473 U.S. 667, 682 (1985).

> [T]here is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced

a different verdict.

*Strickler v. Greene*, 527 U.S. 263, 281 (1999). "Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule." *O'Guinn v. Dutton,* 88 F.3d 1409, 1418 (6th Cir. 1996), citing *United States v. Bagley, supra.*

> "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Favorable evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *see also Jamison v. Collins,* 291 F.3d 380, 385 (6th Cir. 2002)("The prejudice (or materiality) element of a *Brady* violation is established if there is a reasonable probability of a different outcome of the trial had the *Brady* material been available.") For purposes of determining reasonable probability, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

*Castleberry v. Brigano,* 349 F.3d 286, 291 (6th Cir. 2003). *See also United States v. Jones*, 766 F.2d 994, 998 n. 1 (6th Cir. 1985)("In the absence of prejudice, even assuming a violation of *Brady*, reversal is not required."), citing *United States v. Campagnuolo,* 592 F.2d 852, 861 & n. 9 (5th Cir. 1979).

Petitioner claims, *inter alia,* that the prosecution violated petitioner's rights by failing to disclose that the prosecution had met with Adams prior to his testimony and by failing to correct Adams' testimony that he had not met with a representative of the prosecution prior to his testimony. Adams' own affidavit, Doc. No. 84, 88, states that he was contacted by the Assistant United States Attorney on November 9, 1992, *Id.,* a date confirmed in the government's January 13, 1993, §5K1.1 motion to reduce Adams' sentence. *United States v. Ken Lloyd Adams,* CR-2-91-0023(1), Doc. No. 20. November 9, 1992, was the first day of petitioner's trial. Thus, when Adams testified, "I didn't have no discussion. I got a call from the Corrections Officer and they said you have to go to court," *Transcript,* at 363, it would appear that his testimony was accurate.

Even assuming, *arguendo*, that the prosecution in this case improperly failed to disclose or correct Adams' testimony denying that he had met with the prosecutor prior to testifying, petitioner must establish that Adams' testimony in this regard was "material" within the meaning of *Brady v. Maryland, supra*, and that petitioner suffered prejudice.

> [D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' ... In *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), we said, '(t)he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.' *Id.*, at 269, 79 S.Ct., at 1177. ... When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule. *Napue, supra*, at 269, 79 S.Ct., at 1177. We do not, however, automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . .' *United*

> States v. Keogh, 391 F.2d 138, 148 (CA2 1968). A finding of materiality of the evidence is required under Brady, supra, at 87, 83 S.Ct., at 1196, 10 L.Ed.2d 215. A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . .' Napue, supra, at 271, 79 S.Ct., at 1178.

Giglio v. United States, 405 U.S. 150, 153-54 (1972)(citations omitted). As noted in this Court's prior dismissal of petitioner's §2255 petition, petitioner cannot meet this standard in regard to Adams' allegedly false denial regarding a meeting with the government prior to trial. A statement is not material if it is unlikely to have affected the jury's decision. United States v. Farley, 2 F.3d 645, 655 (6th Cir. 1993). The record does not reflect a reasonable likelihood that Adams' statement in this regard affected the outcome of petitioner's case. In any event, defense counsel argued that Adams' testimony lacked credibility, suggesting that Adams hoped for a reduction of his sentence:

> Mr. Adams said he is lonely in jail. It seems to me, from what he was saying, that either one of two things: He was lonely in jail and he misses his friends and he wants to get some of them in there with him, or secondly, he feels bad because he's the only one that is in there. He is in there and Mr. Melville isn't, and he wants Mr. Melville to be in jail, so he is here helping them out.... [R]ule 35(b), that after someone is tried and found guilty, after their trial and their sentence, the government can still come in and ask the Court to change that person's sentence if they provide again that substantial assistan[ce]. Substantial, that has got some teeth in it, and I would submit to you that that is why Mr. Adams is here and he is facing a lot. He is facing – he is not facing – he got 30 years. Now, if he gets anywhere near the reduction that Kim Taylor did, don't you think he would say just about anything in that regard? Thirty years is a long time.

*Transcript, closing arguments*, at 19-20. For both these reasons, this Court concludes that petitioner's claims based on Adams' testimony that he had not met with prosecution representatives prior to trial are without merit.

Petitioner also asserts that he was denied a fair trial because Adams falsely denied that he expected a reduction in his sentence in return for his trial testimony against petitioner. Petitioner specifically refers to the statement to this effect made in Adams' *Statement.* Because the prosecutor's declaration expressly contradicts that statement, there exists a factual dispute as to whether the government promised to file a motion to reduce Adams' sentence in return for his trial testimony against petitioner.[5] Petitioner has alleged facts which, if true, may warrant federal habeas corpus relief. *See Brady v. Maryland, supra*. Under these circumstances, the Court concludes that an evidentiary hearing is necessary to resolve this claim. *See Turner v. United States,* 183 F.3d 474, 477 (6th Cir. 1999).

Therefore, the Magistrate Judge **RECOMMENDS** that petitioner's request for an evidentiary hearing be **GRANTED** in part, and that petitioner be appointed counsel to represent him at an evidentiary hearing on his claim that the prosecutor improperly failed to disclose, or to correct Adams' allegedly false testimony regarding, an agreement to seek reduction of Adams' sentence in return for his testimony against petitioner. The Magistrate Judge further **RECOMMENDS** that petitioner's claim of prosecutorial misconduct based

---

[5] This Court is unable to confidently conclude from the current record that Adams' *Statement,* in which he makes this assertion, is a forgery, as respondent contends.

on Adams' allegedly false testimony denying that he had met with police and the prosecution prior to trial regarding his testimony against petitioner be **DISMISSED**.

If any party objects to this *Report and Recommendation,* that party may, within ten (10) day of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).


November 17, 2008          <u>*s/Norah McCann King*</u>
         Norah McCann King
         United States Magistrate Judge